IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GINGER DUTY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil No. 15-cv-1210-JPG-CJP |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. [1] | ) |
| | ) |

**MEMORANDUM and ORDER**

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Ginger Duty is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits (DIB).

**Procedural History**

Plaintiff applied for benefits on June 13, 2012, alleging disability beginning on February 24, 2010. (Tr. 12.) After holding an evidentiary hearing, Administrative Law Judge (ALJ) Karen Sayon denied the application for benefits in a decision dated May 19, 2014. (Tr. 12-25.) The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1.) Administrative remedies have been exhausted and a timely complaint was filed in this Court.

**Issues Raised by Plaintiff**

Plaintiff raises the following points:

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security. *See* https://www.ssa.gov/agency/commissioner.html (visited Feb. 7, 2017). She is automatically substituted as defendant in this case. *See* Fed. R. Civ. P. 25(d); 42 U.S.C. § 405(g).

1. The ALJ erred in assessing plaintiff's RFC.

2. The ALJ erred in weighing the medical opinion evidence.

3. The ALJ's finding at step five was not supported by substantial evidence.

4. The ALJ erred in assessing plaintiff's credibility.

## **Applicable Legal Standards**

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. 42 U.S.C. §423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's

2

> RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984); *see also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any

fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### **The Decision of the ALJ**

ALJ Sayon followed the five-step framework described above. She determined that plaintiff did not engage in substantial gainful activity from her alleged onset through her date last insured. She found that plaintiff had severe impairments of major depressive disorder, obsessive compulsive disorder, anxiety, status post cervical fusion, and obesity. (Tr. 14.)

The ALJ found plaintiff had the RFC to perform work at the light level, with physical and mental limitations. (Tr. 20-22.) Based on the testimony of a vocational expert, the ALJ found that plaintiff was not able to do her past work. (Tr. 23.) However, she was not disabled because she was able to perform other work that existed in significant numbers in the regional and national economies. (Tr. 24.)

**The Evidentiary Record**

The court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by the plaintiff.

**1. Agency Forms**

Plaintiff was born on September 9, 1967, and was forty-two years old at her alleged onset date. She was insured for DIB through December 31, 2011. (Tr. 192.) She was five feet one inch tall and weighed one hundred and sixty-one pounds. (Tr. 195.) She completed high school in 1985 and had no specialized training. (Tr. 196.) She previously worked as an inspector in a factory, as inventory control in an appliance store, and as a construction worker. (Tr. 197.)

Plaintiff claimed her depression, anxiety, obsessive compulsive disorder, previous neck surgery, short term memory loss, dizziness, and headaches limited her ability to work. (Tr. 195.) In April 2013 plaintiff was taking Clonazepam for insomnia, Lamotrigine and Pristiq for depression, and Luvox for obsessive compulsive disorder. (Tr. 269.)

In September 2012 and February 2013 plaintiff completed function reports. (Tr. 218-25, 255-62.) She lived in a home with her family and helped care for her grandchildren when needed. (Tr. 218-19, 255-56.) She stated that short term memory problems, depression, neck pain, and dizziness limited her ability to work. (Tr. 218, 255.) On a daily basis, plaintiff ate, rested, did a little house work, played a game if she felt well, took a shower, and visited with her children. She was typically in bed by nine p.m. and she stated that she continually wanted to sleep more. While she fixed simple meals for her grandchildren and sometimes fed and gave water to pets, her children primarily took care of the animals and grandchildren. (Tr. 219, 256.) Plaintiff occasionally made herself sandwiches. She was able to clean her house, do some

laundry, and work with flowers. She could clean for about an hour and a half every other week. (Tr. 220, 257.) She did not drive because she was unable to focus. She went shopping once a week for thirty minutes at a time for medicine and food. (Tr. 221, 258.)

Plaintiff claimed she had difficulty lifting, squatting, bending, standing, reaching, walking, kneeling, talking, hearing, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. She could walk about one-fourth of a mile before needing to rest for about two minutes. She could pay attention for five to ten minutes at a time, could follow written instructions if she could recheck them, and could follow spoken instructions only when repeated several times. (Tr. 223, 260.) She handled stress and changes in routine very poorly. (Tr. 224, 261.)

In October 2012, plaintiff's daughter also completed a function report. (Tr. 279-86.) She stated that plaintiff spent most of her day sleeping and watching television, and she occasionally tried to clean. (Tr. 280.) Plaintiff could fix simple meals like sandwiches about once or twice a month and could do light chores around the house. (Tr. 281.) Plaintiff's daughter stated that plaintiff would go to the grocery store about once every other week for one or two hours at a time. (Tr. 282.) She stated that plaintiff had difficulty lifting, squatting, bending, reaching, kneeling, climbing stairs, remembering, completing tasks, concentrating, understanding, following instructions, and getting along with others. (Tr. 284.) She felt that plaintiff did not handle stress or changes in routine well. (Tr. 285.)

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing held on April 22, 2014. (Tr. 31.) The ALJ noted that the applicable time for the record was from plaintiff's alleged onset date in February 2010 until her DIB insurance coverage ended in December 2011. (Tr. 38.)

Plaintiff was 47 years old at the time of the hearing and lived with her husband and her son. (Tr. 37.) She had her driver's license but she did not drive due to issues with concentration. She testified that she had not driven in close to a year.

During the applicable period of disability determination plaintiff drove a car but her concentration began to deteriorate during that time. (Tr. 38.) She had no sources of income and during the time at issue plaintiff made less than $500 babysitting her grandchildren. (Tr. 39.) Plaintiff testified that in the late 1990s she worked as an iron worker in the construction industry. (Tr. 39.) After that, she worked as inventory control at a factory and an appliance store. (Tr. 40.)

In February 2011, plaintiff went into the hospital for a neck problem and had immediate surgery. (Tr. 41-42.) She testified that ten years prior she had bulging discs but she did not have surgery. After that, the left side of her face began to go numb so when she returned to the hospital in 2011 they put spacers between the discs. Within six months of the surgery plaintiff's neck condition was improved. She had difficulty looking up and down quickly because she would get dizzy, but otherwise she was greatly improved. (Tr. 42.)

In the spring of 2010, plaintiff had a partial hospitalization and electroconvulsive therapy (ECT)[2] for mental health issues. (Tr. 43.) She felt that for two or three months the ECT helped her to stop crying frequently and made her able to eat again. (Tr. 43-44.) She was also able to interact more with her family. (Tr. 45.) After two or three months plaintiff was depressed again, and her doctors began changing her medications. (Tr. 44.) Plaintiff testified that for over a year her concentration and short term memory had been poor as a result of her medication changes. (Tr. 43-44.) When plaintiff was depressed she would stay in bed for most of the day, she did not

---

[2] "Electroconvulsive therapy (ECT) is a procedure, done under general anesthesia, in which small electric currents are passed through the brain, intentionally triggering a brief seizure. ECT seems to cause changes in brain chemistry that can quickly reverse symptoms of certain mental illnesses." http://www.mayoclinic.org/tests-procedures/electroconvulsive-therapy/basics/definition/prc-20014161.

7

interact with her family, and would not leave the house. (Tr. 45-46.)  Plaintiff would sleep close to fourteen hours every day. (Tr. 50.)  She stated that prior to her medication changes there were probably eleven or twelve days per month she felt this way. (Tr. 45-46.)  Her daughter, son, and husband took care of the household chores while she was depressed. (Tr. 46.)  At the time of the hearing, she testified that she would lie in bed for most of the day about two or three times per week. (Tr. 47.)

In 2010 and 2011, plaintiff had Christmas and Thanksgiving at her home.  She stated that she would lose her composure frequently during these events. (Tr. 49.)  About eleven or twelve people would come to her home, and plaintiff's attorney pointed out that her doctor told her she should not host the Thanksgiving meal in 2011 due to stress. (Tr. 49, 53.)  Plaintiff testified that she homeschooled her children until 2009 or 2010.  Her older children helped her teach her youngest child when she had difficulty. (Tr. 55.)

Plaintiff testified that she had symptoms of obsessive compulsive disorder (OCD). (Tr. 47.)  She would check and recheck the door locks, repeatedly look through the trash, and recheck what she had on shelves several times a day before she started Luvox. (Tr. 47-48.)  Plaintiff was suicidal at one point and her children had to take away her medications.  They would administer the appropriate drugs to her daily so she could not access them on her own. (Tr. 51.)  Plaintiff had difficulty retaining information when she read after February 2010. (Tr. 54.)  She also had short term memory problems after the ECT treatments. (Tr. 54-55.)  Plaintiff had anger issues during 2010 and 2011 and she did not feel her medications helped control the problem. (Tr. 56.)

A vocational expert (VE) also testified. (Tr. 57-66.)  The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age and work history who was able to perform light work but could not climb ladders,

ropes, or scaffolding and could not tolerate concentrated exposure to hazards such as dangerous moving machinery.  The individual could not perform complex or detailed tasks or instructions, but could maintain sufficient concentration, persistence, or pace to complete routine tasks appropriately and timely.  Additionally, the individual's work should involve simple instructions, simple work-related decisions, only occasional changes in the workplace setting, no public interaction, no fast-paced production requirements, and only occasional interaction with coworkers. (Tr. 60, 62-63.)

The VE testified that the individual could not perform any of plaintiff's previous work. (Tr. 61.)  However, the individual could perform jobs that exist in a significant number within the national and regional economies.  Examples of such jobs are house keeper, laundry folder, and light packagers. (Tr. 61-63.)  The VE testified that if the individual missed more than one day of work in the first ninety days, or more than ten days of work in a year, all competitive employment would be precluded. (Tr. 63-64.)  Additionally, the person should not be off task more than ten percent of the time. (Tr. 64.)

The VE went on to testify that if the person had a verbal disagreement with a supervisor or coworker twice a month she could not maintain competitive employment. (Tr. 64-65.) Plaintiff's attorney referred to a medical source statement on the record and stated that plaintiff had functional limitations that would preclude work at any skill or exertional level because her limitations are aptitudes required for any job. (Tr. 65.)

### 3.  Medical Evidence

Plaintiff's medical records are extensive. While the Court reviewed the entire record, this opinion will focus on the portions of the record applicable to plaintiff's brief and the ALJ's opinion.  These records are primarily from just before the alleged onset date until the date last

insured, with some additions thereafter.

In February 2010, plaintiff underwent a psychiatric evaluation at St. Mary's Hospital where she stated she experienced episodes of extreme anger towards others as well as feelings of hopelessness and helplessness. (Tr. 317-23.) Plaintiff lacked energy and slept for fifteen hours per day. (Tr. 317.) She was diagnosed with major depressive disorder, generalized anxiety disorder, and obsessive compulsive disorder. She was treated with medication and therapy. (Tr. 322.) In March 2010, plaintiff was admitted for inpatient care when medication failed to reduce her depressive symptoms. (Tr. 298.) She was again diagnosed with major depressive disorder, generalized anxiety disorder, and OCD. (Tr. 299.)

That April plaintiff began ECT treatments. (Tr. 329-523.) She underwent ten treatment sessions that month. In the beginning plaintiff reported that her mood and energy were improving. (Tr. 364, 422.) Towards the end of her treatment plaintiff reported she did not feel better and that she was still very irritable. However, the treating psychiatrist reported plaintiff's affect was brightened and she had an increased affective range and spontaneous smiles. (Tr. 354.) Upon completion of ECT plaintiff began seeing psychiatrist Dr. Simeon Grater. (Tr. 607.) Plaintiff indicated she rarely left home and Dr. Grater's mental status examination indicated plaintiff's mood was depressed and her affect was blunted and restricted. (Tr. 607-08.) Dr. Grater prescribed the stimulant Methylphenidate. (Tr. 609.) In May 2010, plaintiff returned indicating her OCD had returned and she was irritable and slept for ten to twelve hours daily. (Tr. 604.) Dr. Grater stated that her mood was depressed and anxious, her affect was blunted and her thought processes were impaired. (Tr. 605.) In June 2010, plaintiff reported that the ECT treatments helped her depression but her OCD was doing worse. Dr. Grater noted that plaintiff's mood was "remarkably better as time passes from ECT." (Tr. 601.)

In July and August 2010 plaintiff's OCD symptoms worsened, her anxiety returned, and her mood was frequently reported to be irritable and anxious. (Tr. 595-98.) Dr. Grater changed plaintiff's OCD medication but her symptoms continued to persist. (Tr. 597, 600.) In July 2010 plaintiff also reported to her primary care physician, Dr. Suzanne Gauto, and indicated she slept eleven hours a day and on and off throughout the day. (Tr. 919.) In September 2010, plaintiff indicated her depression was no longer a problem and her OCD symptoms were improving but she was sleeping too much. (Tr. 592.) Dr. Grater observed that her affect was blunted and restricted, her mood was anxious, and she had residual OCD symptoms. (Tr. 594.)

Plaintiff's OCD symptoms continued in October, and Dr. Grater observed plaintiff developed a tremor in her right hand. (Tr. 589-90.) He increased her OCD medication but in November she still had tremors but also had nighttime visual phenomena as well as impaired concentration. Plaintiff's depression was in remission. (Tr. 588-91.) In a mental status examination the next month plaintiff had a continued blunted and restricted affect as well as impaired thought processes. (Tr. 584.) Dr. Grater decreased the OCD medication to reduce her tremors but plaintiff reported that her OCD worsened as a result. (Tr. 580-82.)

In February 2011 plaintiff presented with numbness on the left side of her face and upper extremity pain. (Tr. 747.) An MRI of plaintiff's cervical spine revealed mild facet hypertrophy at C3-4, small left C4-5 paracentral disc protrusion causing minor left ventral cord deformity and mild to moderate central spinal canal stenosis. At C4-5 there was mild to moderate left foraminal stenosis and mild right foraminal stenosis. At left C5-6 and C6-7 there were paracentral disc hernias causing left hemi cord flatting and mild to moderate central spinal canal stenosis. (Tr. 801-02.) Doctors performed a cervical discectomy and fusion surgery that month; however, plaintiff continued to experience occasional paresthesia in her upper extremities. (Tr.

531, 545-46.)

In March 2011, Dr. Grater noted that plaintiff had a tremor in her right leg that was pronounced when she was anxious. Plaintiff had an anxious mood, blunted and restricted affect, impaired thought process, and decreased energy. (Tr. 578.) In June 2011 Dr. Grater increased plaintiff's OCD medication, but she remained irritable, anxious, and her thought process was still impaired. Dr. Grater prescribed the antipsychotic medication Risperdal. (Tr. 572.) In August 2011, plaintiff's OCD was causing her to constantly clean her home but she said other than that "everything [was] great." (Tr. 564.) In September 2011 plaintiff was happy and active, and Dr. Grater indicated plaintiff looked and sounded better than ever. (Tr. 561.)

In 2012 plaintiff began seeing psychiatrist Dr. Reno Ahuja, and plaintiff reported memory loss, impaired attention, impaired sleep, anhedonia, OCD, and mood swings. Dr. Ahuja diagnosed plaintiff with major depressive disorder, OCD, and insomnia. (Tr. 822-25, 1115-23.) In August 2011 plaintiff's neurosurgeon opined that she could increase her activity somewhat but that she should be restricted to lifting less than twenty pounds and no overhead lifting. (Tr. 539-40.)

### 4. Opinion of Treating Psychiatrist

In June 2013, Dr. Ahuja completed a mental RFC assessment. (Tr. 1129-32.) Dr. Ahuja indicated plaintiff had moderate limitations in her ability to: remember locations and work-like procedures; understand and remember very short and simple instructions; and make simple work related decisions. She had marked limitations in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them;

complete a normal work-day and work-week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; and to travel to unfamiliar places or use public transportation. (1129-32.)

### 5. RFC Assessments

In October 2012, plaintiff's mental RFC was assessed by state agency psychologist Howard Tin, Psy.D. (Tr. 68-72, 75-78.) He reviewed plaintiff's records but did not examine plaintiff in person. Dr. Tin opined that plaintiff would have mild restrictions in her activities of daily living and moderate difficulties maintaining social functioning. Plaintiff had moderate difficulties in maintaining concentration, persistence, or pace and had no episodes of decompensation on record. (Tr. 72.) He also opined that plaintiff would be moderately limited in her ability to: carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; interact with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 74-76.)

In March 2013, plaintiff had a second mental RFC assessed by state agency psychologist Donald Henson, Ph.D. (Tr. 80-87, 90-93.) He reviewed plaintiff's records but did not examine plaintiff in person. He opined that plaintiff was moderately limited in her ability to: understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or proximity to others without being distracted by them; interact with the general public; and get along with coworkers or peers without distracting them

or exhibiting behavioral extremes. (Tr. 90-91.)

Plaintiff's physical RFC was first assessed in October 2012 by state agency physician B. Rock Oh. (Tr. 72-75.) Dr. Oh felt plaintiff could occasionally lift or carry twenty pounds and frequently lift or carry ten pounds. Plaintiff could stand, walk, or sit for about six hours in an eight hour workday. (Tr. 73.) Dr. Oh opined that plaintiff could never climb ladders, ropes, scaffolds. (Tr. 73.) Additionally, plaintiff should avoid concentrated exposure to hazards such as machinery or heights. (Tr. 74.) Based on his RFC assessment, Dr. Oh felt plaintiff's maximum sustained work capability would be light work and she was "not disabled." (Tr. 78.)

In March 2013, plaintiff's physical RFC was reassessed by state agency physician C.A. Gotway. (Tr. 87-90.) Dr. Gotway found plaintiff to have the same restrictions as those found within Dr. Oh's RFC assessment. (Tr. 88-89.) Dr. Gotway also felt plaintiff was "not disabled" and could sustain light work. (Tr. 93.)

## Analysis

Plaintiff contends that the ALJ erred in forming her RFC assessment, weighing the medical opinions, determining plaintiff could perform certain work at step five, and forming her credibility assessment. As plaintiff relies in part on her testimony, the Court will first consider her argument regarding the ALJ's credibility analysis.

The credibility findings of the ALJ are to be accorded deference, particularly in view of the ALJ's opportunity to observe the witness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Social Security regulations and Seventh Circuit cases "taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from 'merely ignoring' the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility

finding." *Schmidt v. Barnhart*, 395 F.3d 737, 746-47 (7th Cir. 2005), and cases cited therein.

SSR 96-7p requires the ALJ to consider a number of factors in assessing the claimant's credibility, including the objective medical evidence, the claimant's daily activities, medication for the relief of pain, and "any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms." SSR 96-7p, at *3.

The ALJ is required to give "specific reasons" for his credibility findings. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). It is not enough just to describe the plaintiff's testimony; the ALJ must analyze the evidence. *Id.*; *see also Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (The ALJ "must justify the credibility finding with specific reasons supported by the record."). If the adverse credibility finding is premised on inconsistencies between plaintiff's statements and other evidence in the record, the ALJ must identify and explain those inconsistencies. *Zurawski*, 245 F.3d at 887.

The ALJ found plaintiff to be less than credible because she felt her allegations were not supported by objective medical evidence. As plaintiff notes, however, the Seventh Circuit has repeatedly held that an ALJ may not reject a claimant's subjective allegations based solely upon a lack of corroborating objective medical evidence. *Pierce v. Colvin*, 739 F.3d 1046, 1049-50 (7th Cir. 2014); *Villano*, 556 F.3d at 562; *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). Further, while the ALJ discusses a great deal of the medical evidence on record, she fails to explain how it factored into her analysis. She merely summarizes portions the record and broadly states that the evidence does not indicate plaintiff's impairments were severe. (Tr. 18-20.) It seems as though the ALJ formed her RFC assessment and rejected any statements that failed to comport with that assessment. This is error. *See Stark v. Colvin*, 813 F.3d 684, 688 (7th Cir. 2016) (stating, "the ALJ based her credibility finding on her finding about Stark's ability to

work, but a proper assessment requires the reverse.  A finding about Stark's ability to work depends on the credibility of her statements about severe pain.").

The ALJ did not discuss how plaintiff's activities of daily living, medication, treatments other than medication, or work history factor into her analysis.  For example, plaintiff took strong drugs and underwent ECT treatments. (Tr. 299, 572, 597, 604, 408-501.)  The ALJ mentions the drugs and ECT treatments, but she fails to indicate how they factor into her analysis.  While these drugs and treatments alone are not enough to show plaintiff's disabilities were the degree she alleged, the Seventh Circuit has held that it is improbable that "a claimant would undergo pain-treatment procedures. . . in order to increase chances of obtaining disability benefits or that doctors would prescribe these treatments if they thought she were faking." *Goble v. Astrue*, 385 Fed. App'x. 588, 591 (7th Cir. 2010).

The Commissioner argues that plaintiff improved after ECT treatments and therefore the credibility determination is valid.  While plaintiff did have a positive reaction to some ECT treatments, she also has records that indicate she had a depressed mood after treatment (Tr. 605, 608, 823, 825), she had decreased energy and motivation, (Tr. 578, 598, 1115, 1123), and her OCD symptoms worsened. (*e.g.*, Tr. 580, 589, 595-98, 601, 604.)  The ALJ mentions these facts but comes to the conclusion that plaintiff's mental impairments were not as severe as she alleged.  As the Seventh Circuit has noted, a claimant under continuous treatment for chronic mental illness will have both good and bad days.  *Bauer v. Astrue,* 532 F.3d 606, 609 (7th Cir. 2008).  The ALJ must build a "logical bridge" from the evidence to her conclusions, and here she failed to do so.  *Simila v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009).

The erroneous credibility determination requires remand.  "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ

16

explains that the decision did not depend on the credibility finding." *Pierce*, 739 F.3d at 1051. *See also Ghiselli v. Colvin*, 837 F.3d 771, 779 (7th Cir. 2016) (noting that an erroneous credibility determination cannot be deemed harmless error where it informed the ALJ's findings with respect to plaintiff's RFC and ability to do past work and other work).

Reconsideration of plaintiff's credibility will also require a "fresh look" at the medical opinions and plaintiff's RFC. *Pierce*, 739 F.3d at 1051. It is therefore not necessary to analyze plaintiff's other points in detail. The Court nevertheless makes the following observations with regard to the RFC assessment and the step five analysis.

A claimant's RFC is "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 404.1545(a)(1). In other words, RFC is the claimant's "maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis," which means eight hours a day for five days a week or an equivalent work schedule. Social Security Ruling 96-8P, 1996 WL 374184, at *2 (July 2, 1996) ("S.S.R. 96-8P"); *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013).

In assessing a claimant's RFC, the ALJ must consider *all* of the relevant evidence in the record and provide a "narrative discussion" that cites to specific evidence and describes how that evidence supports the assessment. The ALJ's analysis and discussion should be thorough and "[s]et forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work." S.S.R. 96-8, at *5, 7. The Seventh Circuit has held that "the ALJ's decision must be based on testimony and medical evidence in the record, and not on his own 'independent medical findings.'" *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996).

Plaintiff contends that the ALJ failed to identify the evidentiary basis that supported her assessment of plaintiff's mental RFC. The Commissioner contends that the ALJ relied upon the

opinions of the state agency psychological consultants for her RFC assessment. However, as plaintiff notes, the ALJ did not rely on the psychological consultants for the assessment. She gave the opinion evidence of the state agency psychologists "less than great weight" and "no weight" as she found them to be inconsistent and not supported by the record. (Tr. 21-22.) As plaintiff notes, the ALJ did not adequately explain what evidence she did rely upon to determine the limitations she found after she gave these opinions less weight. The Seventh Circuit has held that if there is an "evidentiary deficit" such as this, the ALJ is not permitted to form the medical assessment based on her own lay understanding of the impairments. *Suide v. Astrue*, 371 F. App'x 684, 690 (7th Cir. 2010). Therefore, upon reconsideration the ALJ should reexamine and more thoroughly explain how she arrives at plaintiff's mental RFC determination.

Finally, plaintiff challenges the ALJ's determination at step five that plaintiff could perform the jobs of packager and laundry sorter. Plaintiff contends that the hypothetical presented by the ALJ to the VE involving simple and routine tasks but not work that involved detailed tasks or instructions equates to a level one reasoning skill level within the DOT. This is because jobs that require a person to "apply commonsense understanding to carry out detailed but uninvolved written or oral instructions" require level two reasoning skills. Dictionary of Occupational Titles, 1991 WL 688702 (1991). The jobs the VE presented that plaintiff could perform of packager and laundry sorter require level two reasoning skills. 1991 WL 683797, INSPECTOR AND HAND PACKAGER, DICOT 559.687-074; 361.687-014; 1991 WL 672991, CLASSIFIER, DICOT 361.687-014. This Court agrees the ALJ erred in failing to resolve the conflict between the VE's testimony and the DOT standards. On remand, the Commissioner should rectify this inconsistency. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994) (explaining that when the ALJ relies on a series of jobs and all but one are precluded, remand is

necessary); *Overman v. Astrue*, 546 F.3d 456 (7th Cir. 2008) (explaining that the ALJ has a duty to resolve conflicts between the VE's testimony and the DOT and that conflicting information may not be sufficient to support the ALJ's decision).

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Ms. Duty is disabled or that she should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Ginger Duty's application for social security disability benefits is **REVERSED and REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of **42 U.S.C. § 405(g).**

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:  February 21, 2017**

                                                            s/ J. Phil Gilbert
                                                            **J. PHIL GILBERT**
                                                            **DISTRICT JUDGE**